IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WATERLOO SPARKLING WATER CORP., | § | Civil Action No. 1:21-CV-161-RP |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TREATY OAK BREWING AND | § | |
| DISTILLING CO., LLC, TREATY OAK | § | |
| BRANDS, LLC, TREATY OAK | § | |
| OPERATIONS, LLC, TREATY OAK | § | |
| HOLDINGS, LLC, SPIRITED COCKTAILS | § | |
| CORPORATION, DANIEL BARNES, and | § | |
| BRANDON CASON, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**PLAINTIFF'S OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and Local Rule CV-65, Plaintiff Waterloo Sparkling Water

Corp. ("Plaintiff" or "Waterloo") requests an order preliminarily enjoining Treaty Oak Brewing

and Distilling Co., LLC, Treaty Oak Brands, LLC, Treaty Oak Operations, LLC, and Treaty Oak

Holdings, LLC, (collectively, "Treaty Oak") and Daniel Barnes from the infringement of

Waterloo trademarks and trade dress that threatens to cause Waterloo immediate and irreparable

harm.

## TABLE OF CONTENTS

INTRODUCTION AND CERTIFICATE OF CONFERENCE ..................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 3

    A.    Waterloo Introduces Waterloo Sparkling Water ................................................... 3

    B.    The WATERLOO Trademarks and Trade Dress ................................................... 4

    C.    Defendants and their Spirits Products ................................................................... 6

    D.    Defendants' Threatened Launch of the Infringing Products .................................. 6

    E.    The Infringing Products Are Causing Confusion ................................................. 9

    F.    Waterloo's Efforts to Resolve this Dispute ........................................................ 10

ARGUMENT ........................................................................................................................... 11

I.    WATERLOO IS LIKELY TO SHOW THAT DEFENDANTS SEEK TO
INFRINGE ITS TRADEMARK AND TRADE DRESS RIGHTS ................................. 11

    A.    Waterloo Possesses Legally Protectable Trademark and Trade Dress Rights ...... 12

        1.    Waterloo Owns the WATERLOO Name for Sparkling Beverages .......... 12

        2.    Waterloo Has Priority of Use and Registration ....................................... 13

        3.    Waterloo Possesses Legally Protectable Trade Dress ............................. 16

    B.    Defendants' Continued Infringement of Waterloo's Trademark and Trade Dress
Are Likely to Cause Confusion .......................................................................... 17

        1.    Type of Mark ........................................................................................... 18

        2.    Similarity Between the Two Marks ......................................................... 18

        3.    Similarity of the Products ........................................................................ 19

        4.    Identity of Purchasers ............................................................................. 19

        5.    Identity of Advertising Media Used ........................................................ 20

        6.    Defendants' Intent ................................................................................... 20

        7.    Evidence of Actual Confusion ................................................................. 21

        8.    Degree of Care Exercised by Potential Purchasers .................................. 21

II.    WATERLOO WILL SUFFER IRREPARABLE HARM ABSENT AN
INJUNCTION ............................................................................................................... 22

III.    THERE IS NO COGNIZABLE HARM TO TREATY OAK AND
        BARNES FROM PRESERVING THE STATUS QUO .................................................. 24

IV.     THE PUBLIC INTEREST COUNSELS STRONGLY IN FAVOR OF AN
        INJUNCTION ............................................................................................................. 25

CONCLUSION ........................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Abraham v. Alpha Chi Omega*,
    708 F.3d 614 (5th Cir. 2013) ......................................................................................... 22

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*,
    518 F.3d 321 (5th Cir. 2008) .................................................................................. 18, 20

*Chevron Chem. Co. v. Voluntary Purchasing Groups*,
    659 F.2d 695 (5th Cir. Unit A Oct. 1981) ..................................................................... 20

*Coach v. Brightside Boutique*,
    2012 WL 32941 (W.D. Tex. Jan. 6, 2012) .................................................................... 22

*Elvis Presley Enters. v. Capece*,
    141 F.3d 188 (5th Cir. 1998) ......................................................................................... 14

*Emerald City Mgmt. v. Kahn*,
    624 F. App'x 223 (5th Cir. 2015) .................................................................................. 11

*Falcon Rice Mill v. Cmty. Rice Mill*,
    725 F.2d 336 (5th Cir. 1984) ......................................................................................... 18

*Fletcher's Original State Fair Corny Dogs v. Fletcher-Warner Holdings*,
    434 F. Supp. 3d 473 (E.D. Tex. 2020) .......................................................................... 23

*Good Gov't v. Coal. for Better Gov't*,
    901 F.3d 498 (5th Cir. 2018) ............................................................................. 18, 19, 21

*Myo, LLC v. Brull & York, LLC*,
    2019 WL 136820 n.8 (W.D. Tex. Jan. 8, 2019) ........................................................... 22

*Osgood Heating & Air Conditioning v. Osgood*,
    2004 WL 3436800 (W.D. Tex. Dec. 21, 2004) ............................................................ 25

*Petro Franchise Sys. v. All Am. Props.*,
    607 F. Supp. 2d 781 (W.D. Tex. 2009) ........................................................................ 24

*Qualitex Co. v. Jacobson Prod. Co.*,
    514 U.S. 159 (1995) ....................................................................................................... 17

*Quantum Fitness v. Quantum LifeStyle Ctrs.*,
    83 F. Supp. 2d 810 (S.D. Tex. 1999) ............................................................... 14, 22, 23

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) ......................................................................................... 18

*Streamline Prod. Sys. v. Streamline Mfg.*,
    851 F.3d 440 (5th Cir. 2017) ................................................................................. passim

*Sun-Fun Prods. v. Suntan Research & Devel.*,
    656 F.2d 186 (5th Cir. Unit B Sept. 1981) ................................................................... 18

*Tempur-Pedic N. Am. v. Mattress Firm*,
    2017 WL 2957912 (S.D. Tex. July 11, 2017) ............................................................... 22

*Test Masters Educ. Servs. v. State Farm Lloyds*,
    791 F.3d 561 (5th Cir. 2015) ......................................................................................... 16

*TrafFix Devices v. Mktg. Displays*,
    532 U.S. 23 (2001) ......................................................................................................... 17

*Two Pesos v. Taco Cabana*,
 505 U.S. 763 (1992) ............................................................................ 12, 13, 16
*Uptown Grill v. Camellia Grill Holdings*,
 920 F.3d 243 (5th Cir. 2019) ................................................................... 16
*Valley v. Rapides Parish Sch. Bd.*,
 118 F.3d 1047 (5th Cir. 1997) ................................................................. 23
*Wal-Mart Stores v. Samara Bros.*,
 529 U.S. 205 (2000) ................................................................................ 16
*Westchester Media v. PRL USA Holdings*,
 214 F.3d 658 (5th Cir. 2000) ................................................................... 14
*Xtreme Lashes v. Xtended Beauty*,
 576 F.3d 221 (5th Cir. 2009) ........................................................... passim
*Zatarains v. Oak Grove Smokehouse*,
 698 F.2d 786 (5th Cir. 1983) ............................................................ 13, 16

## STATUTES

15 U.S.C. § 1057(c) ....................................................................................... 13

## OTHER AUTHORITIES

5 McCarthy on Trademarks and Unfair Competition § 30:2 (4th ed. 2001) ............................... 22

## INTRODUCTION AND CERTIFICATE OF CONFERENCE

Plaintiff Waterloo Sparkling Water Corp. ("Waterloo") brings this motion to prevent a former employee and his current company from introducing an alcoholic seltzer product that mimics and seeks to exploit Waterloo's popular and successful brand identity. Defendants' conduct creates a serious risk that unsuspecting customers will confuse their ready-to-drink, sparkling gin cocktail for Waterloo's refreshing sparkling water. They should be enjoined.

Waterloo owns a federal trademark registration for WATERLOO SPARKLING WATER® & Design and is the common law owner of WATERLOO for effervescent, ready-to-drink beverages. Earlier this year, Waterloo learned that Defendants were conspiring to jointly introduce a "WATERLOO NO. 9 GIN SPRITZ" in canned packaging virtually identical to the distinctive Waterloo trade dress that appears on hundreds of millions of cans of sparkling water every year:



Defendants Barnes and Cason are former employees of Waterloo and the current CEOs of Defendants Treaty Oak and Spirited Cocktails. In marketing presentations and media interviews touting their new product, Cason bragged about "co-found[ing] Waterloo Sparkling Water, a zero-calorie sparkling water brand [that] sold 100 million cans during [its] first year in market" and claimed that "today, [] this brand is on a mission to offer a breakthrough, better-for-you . . . adventure-ready canned cocktail." Declaration of Kathleen Maurella ("Maurella Decl.")

Ex. 14 at 4. He claimed that Defendants' canned cocktail products are made by mixing Waterloo's sparkling water and malt alcohol. *Id.*

Of course, these claims are false. Cason and Barnes were terminated from Waterloo, and Waterloo has no involvement with their canned cocktail endeavors. The Waterloo No. 9 Gin Spritz is an illegal ploy to exploit Waterloo's name and trade dress. Left unchecked, Defendants will undermine Waterloo's brand identity, create confusion in the marketplace, and risk causing innocent consumers to mistake an alcoholic seltzer for non-alcoholic sparkling water.

In response to a cease and desist letter and the filing of this Action, Defendants informed Waterloo that they were ending or "redesigning" the gin spritz product. Since then, counsel for Waterloo engaged in extensive, good faith meet-and-confer efforts to resolve the subject matter of this motion by agreement. As a result of those discussions, Defendants Spirited Cocktails and Cason have agreed not to release or participate in any further efforts to market an alcoholic seltzer product under the WATERLOO name.

Defendants Treaty Oak and Barnes, however, have refused to make any such agreement or to provide Waterloo with meaningful assurance that they will not seek to exploit its brand identity to market an alcoholic seltzer product. After initially promising that they would not release a WATERLOO-branded alcoholic seltzer until this matter was resolved, Treaty Oak and Barnes have withdrawn those assurances and will not even tell Waterloo whether such a product is currently in process. And over the course of dozens of emails and at least four telephone conversations, Treaty Oak and Barnes have also refused Waterloo's request that they obviate the need for immediate motion practice by agreeing to provide advance notice of a WATERLOO-branded alcoholic seltzer throughout the pendency of this litigation. Accordingly, Waterloo has no choice but to seek a preliminary injunction to protect its brand.

## FACTUAL BACKGROUND

**A.     Waterloo Introduces Waterloo Sparkling Water**

Waterloo Sparkling Water is a nationally popular sparkling beverage with its roots in Austin, Texas. Waterloo was founded in 2017 and began selling its flavored sparkling water beverages under the WATERLOO SPARKLING WATER® design mark the same year. Maurella Decl. ¶ 2.

Waterloo recognized that consumers wanted healthy, low-calorie alternatives to sugary beverages and sodas. *Id*. ¶ 3. But consumers also wanted robust, richer flavors that, unlike Waterloo's competitors, truly "hit the spot" for cravings. *Id*. Incorporating these insights, Waterloo launched its lineup of sparkling beverages that feature distinct, compelling flavors along with Waterloo's signature visual identity and packaging design. *Id*. ¶ 4.

Waterloo Sparkling Water has quickly proved to be a runaway success with consumers. In just over three years since its founding in 2017, Waterloo has gone from $0 to $79 million in annual sales. *Id*. ¶ 5. Last year alone, Waterloo sold more than 270 million cans of sparkling water. *Id*. ¶ 5. Today, Waterloo Sparkling Water is available in more than 15,500 retail stores across the country, including major chains like Whole Foods, Costco, Target, Kroger, Walmart, and Publix, as well as online at retailers such as Amazon. *Id*. ¶ 6. Waterloo Sparkling Water is one of the most popular emerging beverage brands in the country and has garnered national press attention and awards lauding its taste and quality. *Id*. ¶ 7.

Because many of its customers consume sparkling water in conjunction with or as an alternative to cocktails, Waterloo also sells its sparkling water in liquor stores such as Bev Mo, Specs, Twin Liquors, Goody Goody, and Go Puff, as well as via home delivery services. *Id*. ¶¶ 21-22. Waterloo also partners with liquor brands to bring to life WATERLOO cocktails, cross

promoting its sparkling water with brands such as Grey Goose vodka and Los Altos Tequila. *Id*. ¶¶ 24-28 & Exs. 8, 9. Through these cross-promotions – handled in a manner so that consumers cannot be confused about whether they are consuming alcohol – Waterloo encourages consumers to mix its sparkling water with partner spirits to create refreshing and sparkling cocktails. *Id*. And Waterloo promotes cocktail recipes on its social media channels. *Id*. ¶ 23 & Ex. 7.

### B.     The WATERLOO Trademarks and Trade Dress

Waterloo has carefully developed and protected its distinctive trademarks, trade dress, and brand. On March 22, 2017, Waterloo applied to register the WATERLOO SPARKLING WATER® design mark with the United States Patent and Trademark Office ("USPTO"). *Id*. ¶ 8. The USPTO approved the application and Waterloo obtained U.S. Trademark Registration No. 5356607 on December 12, 2017. *Id*. Ex. 1. The registration covers the text and design of Waterloo's signature logo:



Waterloo also owns exclusive nationwide common law trademark rights to "WATERLOO" in connection with sparkling beverages. Since 2017, Waterloo has sold hundreds of millions of cans of Waterloo Sparkling Water across the country and by April 2018 was for sale in all 50 U.S. states. *Id*. ¶ 10. Waterloo has collaborated with spirits brands to encourage consumers to use Waterloo Sparkling Water to create refreshing alcoholic spritzes for appropriate occasions. *Id*. ¶¶ 24-28. To Waterloo's knowledge, there is no other sparkling beverage brand in the United States that uses the term "WATERLOO," whether for alcoholic or non-alcoholic sparkling beverages. *Id*. ¶ 11. As a result, Waterloo is the sole owner of common law rights to "WATERLOO" in connection with sparkling beverages in the United States.

Waterloo's trade dress is also distinctive and protected. Waterloo's representative trade dress (the "Waterloo Trade Dress") appears below:



*Id.* Ex. 2. Distinctive elements of Waterloo's trade dress include its combination of: (a) a large, brightly colored "WATERLOO" in a serif, fanciful font, (b) a prominent ornamental banner with waving and curling ends, (c) curving lines and tendrils, (d) placement of a bold, all-caps flavor label centered on the bottom portion of the can, (e) calorie and sugar claims in light colors on the upper lip of the can, and (f) a tan or lightly color-tinted background. Waterloo's unique combination of these features serves as a source identifier allowing consumers to recognize the origin of Waterloo's products.

Waterloo has invested millions of dollars to market, advertise, and grow its brand and consumer goodwill under the WATERLOO SPARKLING WATER® design mark, the WATERLOO word mark, and the Waterloo Trade Dress. *Id.* ¶ 13. It has spent more than $8 million on marketing and advertising in the last four years, including $4 million 2020. *Id.* Waterloo actively promotes and advertises Waterloo Sparkling Water in digital advertising campaigns spanning Google, popular websites, the online platforms of major retailers, Facebook, Instagram, and Twitter – as well as its own social media accounts, where it enjoys tens of thousands of followers. *Id.* ¶¶ 14-15. At any given moment, Waterloo has millions of ad impressions on business, entertainment, and health & wellness websites. And in 2020, social media posts featuring Waterloo Sparkling Water generated over 320 million user impressions –

nearly equivalent to one interaction for every person in the United States. *Id.* ¶ 16. Waterloo is ranked among the top sparkling water brands in the country and has been praised by numerous celebrities from Justin Bieber to Alec Baldwin to NBA legend Chris Bosh. *Id.* ¶ 17 & Ex. 3.

As a result of its marketing efforts and public recognition, Waterloo is the owner of an exceptionally popular and ubiquitous national brand with highly distinctive trademarks and trade dress. *Id.* ¶ 20.

### C.      Defendants and their Spirits Products

Defendants Daniel Barnes and Brandon Cason were early members of the Waterloo team, where Barnes worked in operations between 2017 and 2018 and Cason served as Waterloo's Chief Marketing Officer between 2017 and 2019. *Id.* ¶ 31. Waterloo terminated Barnes's employment in 2018 and terminated Cason's employment in 2019. *Id.* ¶ 34.

Cason is now the CEO of Spirited Cocktails, which sells alcoholic seltzer beverages under the brand name "Canteen." *Id.* ¶ 38. Barnes is the CEO of Defendant Treaty Oak Brewing and Distilling Co. LLC and its affiliates, including Treaty Oak Brands, LLC, Treaty Oak Operations, LLC, and Treaty Oak Holdings, LLC (together "Treaty Oak"). *Id.* ¶ 36. Treaty Oak makes a line of eponymous whiskeys under its Treaty Oak brand. Treaty Oak also has sold gin under the name "WATERLOO NO. 9 GIN" in Texas but has never used the name "WATERLOO" in connection with a canned or carbonated beverage product. *Id.* ¶ 37.

### D.      Defendants' Threatened Launch of the Infringing Products

In the Fall of 2020, Waterloo conducted an equity investment round as part of which Barnes and Cason sold more than $7 million of shares. Soon thereafter, they began planning to launch an infringing line of products called "Waterloo Gin Spritz" (the "Infringing Products"). *Id.* ¶ 39. The design of the Infringing Products is virtually identical to Waterloo's trade dress, as shown below:



| Waterloo Products | Infringing Products |
|---|---|

*Id*. Ex. 10.

Release was imminent at the time of this suit. Defendants were marketing the Infringing Products to retailers, leading confused market participants to contact Waterloo. *Id*. ¶¶ 48-49 & Ex. 15. Defendants had also obtained Certificates of Label Approval from the United States Alcohol and Tobacco Tax and Trade Bureau for their infringing products. *Id*. Exs. 11-13.

In media appearances promoting the infringing WATERLOO gin spritz, Defendants implied that their products are endorsed by Waterloo. Defendant Cason gave an interview to *Forbes* in which he previewed the launch of the Infringing Products, stating that he and Defendant Barnes intend to launch "our Waterloo Botanicals Gin Spritz brand which is a unique twist on a refreshing gin soda" and that this was a "no-brainer" based on his experience at Waterloo. *Id*. Ex. 14 at 4. Touting Cason's claim to be a co-founder of Waterloo, the article

asserted that "Waterloo Sparkling Water, a zero-calorie sparkling water brand available in numerous innovative flavor varietals . . . is on a mission to offer a breakthrough, better-for-you alternative to other malt liquor seltzers; blending real vodka and all-natural ingredients to create an adventure-ready canned cocktail." *Id*. In the same interview, Cason stated that the canned cocktail ideas he and Barnes developed are based on "mix[ing] Waterloo" with spirits. *Id. Forbes* corrected the inaccuracies in the article after receiving a letter from Waterloo.

At no point in their promotional efforts did Defendants attempt to link their Waterloo No. 9 Gin Spritz to Treaty Oak's own products or branding. Indeed, the Infringing Products represent a complete break with Treaty Oak's traditional brand identity and focus on distilled spirits. Rather than an extension of Treaty Oak's "WATERLOO NO. 9 GIN", the gin spritz is a completely different product that imitates Waterloo Sparkling Water – in its fanciful rococo design, in flavor, in coloring, in the complete omission of any reference to "Treaty Oak", and in the prominent use of the word "Waterloo":



This is not surprising as Treaty Oak is a distiller that has never sold a canned or sparkling beverage product. Declaration of Jeffrey M. Theodore ("Theodore Decl.") ¶ 32 & Ex. 25. Treaty Oak's trademark registration – applied for only after Waterloo secured its trademark and was selling tens of millions of cans across all fifty states – is limited to "spirits." *Id*. Ex. 26 at 1.

Treaty Oak only sought to expand into sparkling, ready-to-drink cocktails after Waterloo became a successful, nationally popular sparkling water brand and Treaty Oak saw an opportunity to capitalize on Waterloo's goodwill and fame.

       **E.**     **The Infringing Products Are Causing Confusion**

Defendants' Infringing Products generated confusion in the marketplace *even before* being publicly released and even among knowledgeable industry professionals. Earlier this year, a cross-promotional partner contacted Waterloo to express surprise and confusion about its apparent expansion into alcoholic seltzer. Maurella Decl. ¶¶ 48-49 & Ex. 15. A buyer at one of their retail accounts had learned of the forthcoming "Waterloo No. 9 Gin Spritz" and thought that Waterloo was coming out with the new product. *Id*.

The fact that Defendants' Infringing Products are already generating confusion among sophisticated retail buyers means they are certain to generate even more confusion if released to the general public. *Id*. ¶ 50. Consumers who are deceived into purchasing or consuming the Infringing Products instead of Waterloo Sparkling Water will be confused, disappointed, and less likely to purchase Waterloo's product in the future. Defendants' Infringing Products will divert sales from Waterloo Sparkling Water. And sales of the Infringing Products will cause Waterloo to lose control over the consumer goodwill and experience associated with its trademarks and trade dress, irreparably harming Waterloo's brand.

The association with alcohol means that any confusion may have devastating health effects. In addition to customers who mix Waterloo Sparkling Water with cocktails, Waterloo is popular among consumers who cannot drink alcohol or choose not to do so. *Id.* ¶ 30. This includes families with small children, teenagers, pregnant women, and consumers with medical conditions. *Id*. Waterloo can control the brand presentation when it engages in a collaboration or even if it were to market a WATERLOO canned cocktail so as to ensure that consumers do not

mistake an alcoholic seltzer for sparkling water. But Defendants' copying deprives Waterloo of any such control. As a result, this case presents a severe risk of irreparable harm to consumers and to Waterloo if Defendants' infringement is not enjoined.

### F.     Waterloo's Efforts to Resolve this Dispute

Upon learning of the Infringing Products, Waterloo immediately sent a cease and desist letter to Defendants seeking assurances that they would not proceed with their launch of the Infringing Products. Theodore Decl. ¶ 2. Defendants ignored these requests and continued to promote the Infringing Products – including the Forbes interview that appeared in press *after* their receipt of Waterloo's cease and desist letter. As a result, Waterloo filed this suit. *Id*. ¶¶ 3-4.

Since then, Waterloo has attempted to work with Defendants to avoid the need for this motion. Cason and Spirited Cocktails have agreed to abjure the use of Waterloo and the Waterloo Sparkling Water trade dress on any further alcoholic seltzer product. That agreement is reflected in the stipulated injunction and consent order that has been filed with the Court.

However, Treaty Oak and Barnes have refused to provide any such assurances. Initially, Treaty Oak and Barnes agreed not to introduce any "Waterloo" alcoholic seltzer product until the Parties were able to resolve this dispute. *Id*. ¶¶ 8-10 & Exs. 3-5. Subsequently, however, Treaty Oak and Barnes recanted that agreement and reserved the right to introduce a "Waterloo" alcoholic seltzer, promising only that they would not use the *exact* packaging that they had previously planned and that any product would not be one they deemed confusing. *Id*. ¶¶ 11-29 & Exs. 6-23. Treaty Oak and Barnes will not tell Waterloo whether such a product is in the works and would not agree even to give Waterloo advance notice and an opportunity to object before they introduce a "WATERLOO" alcoholic seltzer while the Parties' claims are being resolved. *Id*. Faced with the threat that Treaty Oak will introduce a "WATERLOO" gin spritz without notice, Waterloo brings this motion.

## ARGUMENT

The Court should enter a preliminary injunction barring Treaty Oak and Barnes from introducing a knockoff alcoholic seltzer product that takes advantage of Waterloo's brand equity. Preliminary injunctive relief is proper where there is: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm absent an injunction; (3) a balance of hardships favoring an injunction; and (4) no detriment to the public interest." *Emerald City Mgmt. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015).

As the dominant user of "WATERLOO," the only user in the sparkling beverage space, and the owner of distinctive trade dress, Waterloo is likely to succeed in establishing that Defendants' efforts to sell alcoholic seltzer products under virtually identical branding violate the Lanham Act. In the interim, the exploitation of Waterloo's brand by an alcoholic knockoff is likely to irreparably damage Waterloo's goodwill and brand identity and put vulnerable consumers directly at risk when they accidentally drink an Infringing Product containing alcohol.

## I.    WATERLOO IS LIKELY TO SHOW THAT DEFENDANTS SEEK TO INFRINGE ITS TRADEMARK AND TRADE DRESS RIGHTS

Waterloo is likely to succeed on its trademark and trade dress claims because it has senior rights to use "WATERLOO" for sparkling beverages and because Defendants have demonstrated their intention to capitalize on Waterloo's goodwill by copying Waterloo's branding and then claiming an affiliation with Waterloo in their promotional efforts. This constitutes infringement under the Lanham Act, which requires that: "(1) [plaintiff] possesses a legally protectable trademark and (2) [defendant's] use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'" *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 450 (5th Cir. 2017). "The elements of common law trademark infringement under Texas law are the same as those under the Lanham Act." *Id*.

11

### A.   Waterloo Possesses Legally Protectable Trademark and Trade Dress Rights

### 1.   Waterloo Owns the WATERLOO Name for Sparkling Beverages

Waterloo owns legally protectable trademark rights in the WATERLOO SPARKLING WATER® design mark, which it has registered with the United States Patent and Trademark Office, and the WATERLOO word mark, which it has used on hundreds of millions of cans of sparkling water sold throughout the United States and on cross-promotions for cocktails that mix Waterloo sparkling water with premium spirits brands.

A trademark is "any word, name, symbol, or device, or combination thereof" that is used by its owner "to identify and distinguish his or her goods […] from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "A mark must be 'distinctive' in one of two ways: (1) inherent distinctiveness or (2) acquired distinctiveness through secondary meaning." *Streamline*, 851 F.3d at 451 (cleaned up). "Registration of a mark with the PTO is prima facie evidence that the mark is inherently distinctive." *Id*. (alteration marks omitted). As owner of U.S. Trademark Registration No. 5356607 for the WATERLOO SPARKLING WATER® design mark, Waterloo's mark is presumed to be inherently distinctive.

Waterloo's trademarks also are inherently distinctive in their own right. "Marks are normally assigned to 'categories of generally increasing distinctiveness': (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Xtreme Lashes v. Xtended Beauty*, 576 F.3d 221, 227 (5th Cir. 2009) (quoting *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992)). "A descriptive term provides an attribute or quality of a good;" "a suggestive term suggests, but does not describe, an attribute of the good;" while "arbitrary" and "fanciful" marks have no pre-existing connection to the good. *Id*. Suggestive, arbitrary, and fanciful marks "are deemed inherently distinctive." *Id*.

12

Neither WATERLOO in a stylized and fanciful font nor the term WATERLOO standing alone inherently describe sparkling beverages. The WATERLOO SPARKLING WATER® design and WATERLOO word mark are therefore inherently distinctive. *See Xtreme Lashes*, 576 F.3d at 227 (finding XTREME LASHES inherently distinctive).[1]

### 2.    Waterloo Has Priority of Use and Registration

Waterloo also has nationwide priority of use for the registered WATERLOO SPARKLING WATER® design mark and the common law WATERLOO word mark in connection with sparkling beverages. Treaty Oak has never been in the sparkling beverage or canned cocktail space, whether under the WATERLOO name or otherwise.

Waterloo applied to register the WATERLOO SPARKLING WATER® design mark on March 22, 2017 and was granted registration on December 12, 2017. Maurella Decl. ¶ 8 & Ex. 1. As a result, Waterloo is entitled to nationwide "constructive use" priority with the same effect as if Waterloo began selling its goods in all 50 states on March 22, 2017. 15 U.S.C. § 1057(c). Waterloo also rolled out nationally in every Whole Foods store in 2017. By April 2018, Waterloo had expanded its sales under the WATERLOO name into all 50 states, thereby obtaining nationwide common law trademark and trade dress rights.

Waterloo's rights extend to alcoholic sparkling beverages. "Direct competition between the parties' services or products is not required" for a mark holder to enforce its rights so long as "the junior user's services are in a market that is one into which the senior user would naturally

---

[1] A merely descriptive trademark must have acquired distinctiveness among consumers as the source of the owner's goods, known as "secondary meaning." *Two Pesos*, 505 U.S. at 769. While unnecessary because they are arbitrary or fanciful, Waterloo's marks have secondary meaning by virtue of Waterloo's multi-million-dollar marketing investment and continuous sales of hundreds of millions of cans in all 50 states. Maurella Decl. ¶¶ 11, 13; *see Zatarains v. Oak Grove Smokehouse*, 698 F.2d 786, 795 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up v. Lasting Impression I*, 543 U.S. 111 (2004) ("manner of advertising, volume of sales, and length and manner of use may serve as circumstantial evidence" of secondary meaning).

expand." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998). Other non-alcoholic sparkling beverage brands such as Spindrift, Topo Chico, Polar Seltzer, and Sparkling Ice have expanded directly into alcoholic sparkling beverage products, confirming that expansion into this category is natural and expected among consumers. Maurella Decl. ¶ 29. And Waterloo's customers say in focus groups that they expect it to introduce an alcoholic seltzer. *Id*. ¶ 21; *see Quantum Fitness v. Quantum LifeStyle Ctrs.*, 83 F. Supp. 2d 810, 826 (S.D. Tex. 1999) (finding infringement where the "complementary nature of the goods" meant senior user "might expand into the [junior user's] business"); *Westchester Media v. PRL USA Holdings*, 214 F.3d 658, 666 (5th Cir. 2000) (POLO magazine infringed Ralph Lauren trademark because "the consuming public could believe there is an association" though Ralph Lauren did not publish a magazine).

Indeed, Waterloo is already competing nationwide in the market against alcoholic seltzers and cocktails. At least 20% of customers report that they sometimes drink Waterloo Sparkling Water instead of alcoholic beverages, while more than 25% drink Waterloo Sparkling Water as a mixer with cocktails. Maurella Decl. ¶ 21 & Exs. 5-6. Waterloo Sparkling Water is therefore sold in liquor stores and appears in stores alongside alcoholic beverages. *Id*. ¶ 22. Waterloo promotes its product with cocktail and mocktail recipes on its social media channels. *Id*. ¶ 23 & Ex. 7.

Waterloo participates directly in the market for alcoholic seltzers and cocktails by virtue of its many cross-promotions with liquor brands. *Id*. ¶¶ 24-25 & Exs. 7, 8. Waterloo has sold its sparkling water as part of cross-promotions with Grey Goose vodka, Los Altos tequila, and other spirits brands *Id*. ¶¶ 24-28 & Ex. 8. And Waterloo partners with liquor brands to create cocktails at on premise events such as the South Beach Wine & Food Festival. *Id*. ¶¶ 27-28 & Ex. 9.

Waterloo's registration and use of WATERLOO on hundreds of millions of cans of sparkling water across the country, including as part of cross-promotions with spirits and in

conjunction with cocktail recipes in advertising and on social media, give it priority regarding alcoholic seltzers. This is sufficient to prevail over any claim Treaty Oak may make based on the handful of irregular sales it may have made of its spirit product, known as Waterloo No. 9 Gin.

*First*, Waterloo obtained its federal trademark registration and had established its common law rights through national sales distribution before Treaty Oak even applied to register its "WATERLOO NO. 9 GIN" mark for spirits on June 7, 2018. Maurella Decl. ¶¶ 8-10 & Ex. 1; Theodore Decl. Ex. 26.

*Second*, Treaty Oak never attempted to sell *canned or sparkling beverages* until years after Waterloo became a well-known national brand and began competing in the alcoholic seltzer and cocktail space. Maurella Decl. ¶¶ 8-10, 37; Theodore Decl. 32 & Ex. 25. Tellingly, when it did attempt to enter the alcoholic seltzer space, Treaty Oak's marketing, packaging, and public statements sought to associate its Waterloo No. 9 Gin Spritz with Waterloo Sparkling Water. Treaty Oak made no effort to invoke or leverage the branding of its Treaty Oak No. 9 Gin:

| Treaty Oak's Gin Spritz | Waterloo Sparkling Water | Treaty Oak's Gin |
|---|---|---|
|  |  |  |

*Third*, Treaty Oak appears not to have used the name "WATERLOO" for *any purpose* outside of Texas until after Waterloo had registered its mark and was sold in all fifty states. Theodore Decl. Exs. 27, 28; Maurella Decl. ¶¶ 8-10. Thus, in addition to Waterloo's nationwide

priority in canned sparkling beverages, Waterloo has seniority over Treaty Oak as to "WATERLOO" for all purposes in at least 49 states.

### 3.    Waterloo Possesses Legally Protectable Trade Dress

Waterloo is also the owner of rights in its distinctive trade dress for Waterloo Sparkling Water, which are "protectable under section 43(a) of the Lanham Act[.]" *Test Masters Educ. Servs. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015). "Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Uptown Grill v. Camellia Grill Holdings*, 920 F.3d 243, 250 (5th Cir. 2019). Trade dress is distinct from a trademark and "extend[s] to the overall motif" of a product. *Id.* To be protected, trade dress must be "distinctive and nonfunctional." *Test Masters*, 791 F.3d at 565.

Waterloo's trade dress is inherently distinctive because its unique combination of visual elements does not describe or suggest any attribute of its product. There is nothing about a large serif-font "WATERLOO," a prominent ornamental banner, curving lines and tendrils, the placement and font of Waterloo's flavor description, the format and placement of Waterloo's sugar and calorie claims, or the coloration of Waterloo's can background that inherently describes or suggests any attributes of Waterloo's products. The sole purpose of this unique combination of features is to identify the source of Waterloo's products. *See Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 212 (2000) (product packaging is typically distinctive because "[i]n general, the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product"). As such, Waterloo's trade dress is inherently distinctive and protectable. *Two Pesos*, 505 U.S. at 769-70.[2]

---

[2] While not required, Waterloo's trade dress – like its trademarks – has secondary meaning by virtue of Waterloo's extensive advertising, marketing and sales. *Zatarains*, 698 F.2d at 795.

Waterloo's trade dress also is non-functional. "A product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 32 (2001). The appearance of the Waterloo Trade Dress is not "essential to the purpose" of sparkling beverages, because beverages can be enjoyed from a variety of cans regardless of whether they share Waterloo's unique visual appearance. Nor would competitors be placed at a disadvantage by being unable to copy Waterloo Sparkling Water's visual appearance, as demonstrated by the many products in the market that do not copy Waterloo. Defendants have chosen to copy the Waterloo Trade Dress only to obtain on the "reputation-related rewards associated with" Waterloo's goodwill rather than any functional benefit. *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995).

Because the Waterloo Trade dress is distinctive and non-functional, and because Waterloo has priority of use in all 50 states with respect to the Waterloo Trade Dress, Waterloo owns legally protectable rights in its distinctive trade dress for Waterloo Sparkling Water.

### B.   Defendants' Continued Infringement of Waterloo's Trademark and Trade Dress Are Likely to Cause Confusion

Defendants' effort to mimic Waterloo's branding and trade dress are not only likely but expressly calculated to cause confusion in the marketplace. In the Fifth Circuit, the likelihood of confusion is assessed by eight factors. *Streamline*, 851 F.3d at 453. They are:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,] . . . [and] (8) the degree of care exercised by potential purchasers.

*Id.* "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id*. Here, every one of the factors supports Waterloo.

1.     **Type of Mark**

"Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 479 (5th Cir. 2008) (citations omitted). The strength of a trademark is determined by: (1) the conceptual strength of the mark "spectrum," from "generic and descriptive" on one end to "arbitrary and fanciful" on the other; and (2) "the standing of the mark in the marketplace." *Am. Rice v. Producers Rice Mill,* 518 F.3d 321, 330 (5th Cir. 2008) (citing *Falcon Rice Mill v. Cmty. Rice Mill*, 725 F.2d 336, 346 (5th Cir. 1984).

Both factors support the strength of Waterloo's marks and trade dress. The dominant feature of the logo – the word WATERLOO in a stylized and fanciful font – does not inherently describe sparkling water. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 509 (5th Cir. 2018) (mark strong where it was not "intrinsic" to the services offered by the mark's owner). WATERLOO SPARKLING WATER® & Design enjoys "an unrebutted presumption of distinctiveness due to its PTO registration," further enhancing the strength of the mark. *Id.* at 510. And Waterloo's marks and trade dress are exceptionally commercially strong by virtue of its millions of dollars in annual sales, nationwide distribution, and advertising exposure. *See Sun-Fun Prods. v. Suntan Research & Devel.*, 656 F.2d 186, 190-91 (5th Cir. Unit B Sept. 1981).

2.     **Similarity Between the Two Marks**

"Assessing the similarity of the competing marks 'requires consideration of the marks' appearance, sound, and meaning.'" *Streamline*, 851 F.3d at 454. Courts ask whether, "under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* "Similarity of appearance is determined on the basis of the total effect of the designation," but "courts should give more attention to the dominant features of a mark." *Xtreme Lashes*, 576 F.3d at 228.

Here, the Infringing Products copy virtually every aspect of the WATERLOO SPARKLING WATER® design mark, WATERLOO word mark, and trade dress, from the large, brightly colored "WATERLOO" appearing in a serif, fanciful font, to the prominent ornamental banner with waving and curling ends, the curving lines and tendrils, the placement of a bold, all-caps flavor label centered on the bottom portion of the can, the appearance of the calorie and sugar claims in light colors on the upper lip of the can, and Waterloo's most popular flavors – of which Cason and Barnes were aware as former personnel and current shareholders of Waterloo.

The infringement thus goes well beyond the similar arrangement of words, colors, and imagery that supports a finding of similarity under this prong. *See All. for Good Gov't*, 901 F.3d at 511. The overall similarity of the marks, in the context of their use, will create a likelihood in the minds of consumers that the two products are associated.

### 3.      Similarity of the Products

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229. The products here are highly similar because both are flavored carbonated water beverages. The only difference is the addition of alcohol to make the Infringing Products. But Waterloo itself participates in the sparkling cocktail market as described above. Waterloo's market research shows that consumers often drink sparkling water as an alternative to cocktails and expect Waterloo to introduce an alcoholic seltzer.

### 4.      Identity of Purchasers

"The greater the overlap between the outlets for, and consumers of, the services, the greater the potential for confusion." *All. for Good Gov't*, 901 F.3d at 512. Here, the products will be offered to the same purchasing consumers through many of the same retail channels. Waterloo is already sold in thousands of outlets that also sell alcoholic beverages, including grocery stores, mass retail, drug stores, and liquor stores. And 55% of Waterloo customers report

consuming spiked seltzers at least several times per year. Waterloo has already received outreach from a confused and surprised partner who encountered the Infringing Products. Waterloo, as the dominant brand, is best positioned to limit confusion by controlling the expansion of its products.

### 5.     Identity of Advertising Media Used

"[A]dvertising in similar media [i]s an indication that consumers might be confused." *Am. Rice*, 518 F.3d at 332; *see also Xtreme Lashes,* 576 F.3d at 229 (finding similar channels where both parties used "print advertisements, direct mailings, and Internet promotion"). Here, Defendants and Waterloo use the same media and advertising channels, including Facebook, Instagram, Twitter, YouTube, and other social and traditional media channels.

### 6.     Defendants' Intent

"Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion." *Streamline*, 851 F.3d at 455. The intent inquiry asks whether Defendants "intended to derive benefits from the reputation of the plaintiff." *Id.*

Here, Defendants' intent does not even need to be inferred. *Cf. Chevron Chem. Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 704 (5th Cir. Unit A Oct. 1981) (Intent can be inferred where "a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer."). Armed with inside knowledge of Waterloo's trademark, trade dress, strategy, and products, Barnes and Cason set out to market products that imitate Waterloo's marks and trade dress and then *bragged about the products' alleged association with Waterloo to the press*. Claiming to be a co-founder of Waterloo, Defendant Cason told *Forbes* that he and Barnes thought it "was a no-brainer to mix Waterloo" with spirits and that their alcoholic seltzers were part of a "Waterloo Sparkling Water . . . mission to offer a breakthrough . . . adventure-ready canned cocktail" as an expansion of its brand. Maurella Decl. Ex. 14.

Similarly, Treaty Oak's complete abandonment of its traditional branding, with straight lines, san-serif fonts, and brooding, cold colors in favor of Waterloo's bright and fanciful branding demonstrates an intention to exploit Waterloo's position in the market. The Fifth Circuit has recognized this type of conduct as evidence of intent. *See All. for Good Gov't*, 901 F.3d at 513 (infringer's departure from its prior mark to a "newer iteration" more similar to plaintiff's mark was evidence of intent to infringe). Defendants Cason and Barnes – former Waterloo employees and current shareholders – sought to imitate Waterloo's trademark and trade dress to misappropriate the consumer goodwill built by Waterloo.

### 7.    Evidence of Actual Confusion

"Evidence that consumers have been actually confused . . . may be the best evidence of a likelihood of confusion." *Streamline*, 851 F.3d at 457. *Id.* There is "a low bar" for this factor: even "a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion," and "a plaintiff may show actual confusion using anecdotal instances of consumer confusion." *Id.*

Here, Defendants' Infringing Products have generated confusion even among sophisticated market participants and even before release. Upon seeing a promotion for the Infringing Products, a cross-promotional spirits partner contacted Waterloo to express surprise and confusion about its apparent expansion into alcoholic seltzer. Maurella Decl. Ex. 15. Absent an injunction, Defendants are likely to generate even more confusion with the general public.

### 8.    Degree of Care Exercised by Potential Purchasers

"Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Streamline*, 851 F.3d at 458. Both sparkling water and sparkling alcoholic seltzer are low-priced consumer goods for which customers exercise a relatively low degree of care, thereby increasing the risk of consumer confusion.

21

\* \* \*

Because all eight factors weigh in Waterloo's favor, and particularly in light of the evidence of Defendants' intent to trade on Waterloo's goodwill, the Court should find that the Infringing Products create a likelihood of confusion. The evidence of similarity and confusion here far exceeds that of cases in which courts in this Circuit have issued preliminary injunctions in trademark and trade dress cases.

## II.    WATERLOO WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Waterloo faces the threat of irreparable harm absent a preliminary injunction. In trademark and trade dress infringement claims, irreparable injury "is presumed" where there has been a showing of a likelihood of confusion. And the facts of this case make irreparable injury even more likely than usual because of the potential for confusion between an alcoholic seltzer and a non-alcoholic beverage enjoyed on all occasions by children and non-drinkers that may occur if Waterloo loses its careful control of the marketing of the brand.

"All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing 5 McCarthy on Trademarks and Unfair Competition § 30:2 (4th ed. 2001)); *see also Myo, LLC v. Brull & York, LLC*, 2019 WL 136820, at \*8 n.8 (W.D. Tex. Jan. 8, 2019) (Pitman, J.) (noting that "likelihood of confusion in a trademark action is generally sufficient to establish risk of irreparable harm").[3]

---

[3] *See also Tempur-Pedic N. Am. v. Mattress Firm*, 2017 WL 2957912, at \*10 (S.D. Tex. July 11, 2017) (plaintiff was entitled to the presumption of irreparable harm because it demonstrated a likelihood of confusion); *Coach v. Brightside Boutique*, 2012 WL 32941, at \*6 (W.D. Tex. Jan. 6, 2012) ("[W]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury.") (citing *Quantum Fitness*, 83 F. Supp. 2d at 831, *report and recommendation adopted*, 2012 WL 13149026 (W.D. Tex. Mar. 16, 2012)).

The evidence too demonstrates Waterloo faces a substantial threat of irreparable harm from Defendants' infringement. Waterloo has developed goodwill from its customers, has established a reputation in the carbonated beverage market, operates in the same markets as Defendants, and cannot control their use of its mark. Maurella Decl. ¶¶ 13, 18, 22. *See Fletcher's Original State Fair Corny Dogs v. Fletcher-Warner Holdings*, 434 F. Supp. 3d 473, 496 (E.D. Tex. 2020) (plaintiff showed a risk of irreparable harm through evidence "that Fletcher's has developed goodwill in at least the Dallas community, that the Defendants are operating in that same community, that consumers are actually confused as to whether they are purchasing Fletch's products or Fletcher's products, and that Fletcher's has no control over the goods and services offered by the Defendants.").

Consumer confusion as to whether the Infringing Products are affiliated with Waterloo will deprive Waterloo of the exclusive use of its trademark and trade dress and leave it powerless to control its reputation and place in the market without an injunction. That causes irreparable harm to customer goodwill and reputation that is difficult to quantify and fully compensate with monetary remedies. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (potential damage to reputation is irreparable injury); *Quantum Fitness*, 83 F. Supp. 2d at 831 (parties could not calculate the monetary damage done by trademark infringement).

The potential for irreparable harm is especially severe because consumers may be confused into consuming an alcoholic product when they intend to drink a sparkling water. Waterloo can control the presentation of its brand in any foray it makes into the alcohol space so that consumers do not mistake an alcoholic seltzer for a non-alcoholic product. But no such control is possible over Defendants' infringement – which attempts to make a gin spritz look identical to Waterloo's sparkling water. If a child accidentally pulls Defendants' "Waterloo" gin

spritz product from the refrigerator while intending to drink Waterloo Sparkling Water, the consequences may be disastrous.

While Waterloo engages in cross-promotions with spirits brands, it does so under circumstances that allow it to control the marketing of the brand and in a way that consumers cannot be confused about whether they are consuming alcohol. Allowing Defendants to infringe undoes all of that by depriving Waterloo of the ability to control the presentation in the market.

Nor do Treaty Oak's vague promises to redesign its infringing products in a way that is not "confusingly similar to the Waterloo Sparkling Water Trade Dress" eliminate the threat of irreparable harm. Treaty Oak has refused to tell Waterloo whether it is proceeding with a "WATERLOO" alcoholic seltzer product and has refused to agree to give Waterloo advance notice of any such product. As a result, Waterloo faces the likelihood that infringing products will appear on store shelves and be presented to Waterloo's retail customers with no notice so long as Treaty Oak has self-servingly concluded that there is no likelihood of confusion. Given Defendants' prior conduct, that does not sufficiently protect Waterloo. Treaty Oak should be required to desist from any packaging infringing the Waterloo name or trade dress.

## III.  THERE IS NO COGNIZABLE HARM TO TREATY OAK AND BARNES FROM PRESERVING THE STATUS QUO

Where, as here, Defendants have knowingly and intentionally infringed Waterloo's trademark and trade dress, the balance of the equities weighs heavily in favor of Waterloo. *See Petro Franchise Sys. v. All Am. Props.*, 607 F. Supp. 2d 781 (W.D. Tex. 2009). Waterloo has already made an enormous investment in developing and marketing its brand.

By contrast, Treaty Oak has never before entered the sparkling beverage space and never sought to do so until it saw an opportunity to capitalize on Waterloo's extensive goodwill and popularity. Moreover, Treaty Oak does not have any product in market and will not suffer any

harm by being required to allow Waterloo the opportunity to raise any trademark and trade dress objections in an orderly and efficient manner.

## IV.    THE PUBLIC INTEREST COUNSELS STRONGLY IN FAVOR OF AN INJUNCTION

One of the primary purposes of the Lanham Act is to protect the public interest by preventing consumer confusion. The public interest is "always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Osgood Heating & Air Conditioning v. Osgood*, 2004 WL 3436800, at *5 (W.D. Tex. Dec. 21, 2004). As Waterloo's mark is entitled to protection, "it necessarily follows that the preliminary injunction serves the public interest." *Id*.

Defendants' deceptive packaging also poses an imminent threat to the safety of the consuming public. Consumers are familiar with Waterloo Sparkling Water as a popular non-alcoholic beverage that is regularly enjoyed by families with children and others who abstain from alcohol. Defendants' copycat alcoholic seltzer products risk confusing vulnerable individuals like children, pregnant women, consumers with medical conditions, and others into consuming alcohol, with potentially disastrous or even fatal results.

## <u>CONCLUSION</u>

For the foregoing reasons, Waterloo requests an order preliminarily enjoining Treaty Oak and Barnes from using the Infringing Marks, the Infringing Trade Dress, the WATERLOO SPARKLING WATER® design mark, the Waterloo Sparkling Water Trade Dress, or the WATERLOO word mark in connection with the sale, offering to sell, advertising, marketing, or distribution of alcoholic seltzer products or similar sparkling beverages in the United States.

Dated: May 4, 2021                        Respectfully Submitted,

                                /s/ *Ryan A. Botkin*
                                Ryan A. Botkin
                                Texas Bar No. 00793366
                                Asra Syed
                                Texas Bar No. 24119398
                                (*TXWD application approved, pending oath*)
                                WITTLIFF | CUTTER PLLC
                                1209 Nueces Street
                                Austin, Texas 78701
                                Tel: 512-960-4730
                                Fax: 512-960-4869
                                ryan@wittliffcutter.com
                                asra@wittliffcutter.com

                                J. Noah Hagey (*pro hac vice*)
                                Jeffrey M. Theodore (*pro hac vice*)
                                J. Tobias Rowe (*pro hac vice*)
                                BRAUNHAGEY & BORDEN LLP
                                351 California Street, 10th Floor
                                San Francisco, CA 94104
                                Tel & Fax: 415-599-0210
                                hagey@braunhagey.com
                                theodore@braunhagey.com
                                rowe@braunhagey.com

                                *Attorneys for Plaintiff*
                                *Waterloo Sparkling Water Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on this fourth day of May, 2021, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User. In addition, this document was served on the following parties, who are not registered on CM/ECF as Filing Users, via e-mail.

Cleveland R. Burke
Waller, Lansden, Dorch & Davis, LLP
100 Congress Avenue, Ste. 1800
Austin, TX 78701
Tel: 512-685-6411
Email: cleveland.burke@wallerlaw.com

*Attorneys for Defendant*
*Spirited Cocktails Corp.*

Justin P. Bagdady
Susan M. Kornfield
Bodman PLC
201 S. Division Street, Suite 400
Ann Arbor, MI 48104
Tel.: 734-930-2727
Email: jbagdady@bodmanlaw.com
Email: skornfield@bodmanlaw.com

*Attorneys for Defendants*
*Treaty Oak Brewing and Distilling Co., LLC,*
*Treaty Oak Brands, LLC, Treaty Oak*
*Operations, LLC, and Treaty Oak Holdings, LLC*

JT Morris
JT Morris Law, PLLC
1105 Nueces Street, Ste. B
Austin, TX 78701
Tel: 512-717-5275
Email: jt@jtmorrislaw.com

*Attorneys for Defendant*
*Brandon Cason*

Peter D. Kennedy
Graves Dougherty Hearon & Moody
401 Congress Avenue, Suite 2700
Austin, Texas 78701
Tel.: 512-480-5764
Email: pkennedy@gdhm.com

*Attorneys for Defendant*
*Daniel Barnes*

/s/ *Ryan A. Botkin*
Ryan A. Botkin

27