IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WATERLOO SPARKLING WATER CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:21-CV-161-RP |
| | § | |
| TREATY OAK BREWING AND | § | |
| DISTILLING CO., LLC, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Plaintiff Waterloo Sparkling Water Corp.'s ("Waterloo") motion for preliminary injunction. (Dkt. 17). The parties filed responsive and supplemental briefing, (Dkts. 32, 40, 42, 51, 54), and the Court held a hearing on the motion, (Dkt. 55). Related to the preliminary injunction motion, Waterloo filed an objection to the report of David Franklyn, who provided an expert report on behalf of Defendants Treaty Oak Brewing and Distilling Co., LLC, Treaty Oak Brands, LLC, Treaty Oak Operations, LLC, and Treaty Oak Holdings, LLC ("Treaty Oak"). (Dkt. 52). Also before the Court is Treaty Oak's motion for leave to file supplemental declaration and sur-reply. (Dkt. 54). Having considered the briefing, the arguments made at the hearing, the evidence, and the relevant law, the Court will deny the preliminary injunction motion.

## I. BACKGROUND

This is a trademark action arising out of the "ready to drink sparkling beverage market" that has "exploded." (Prelim. Inj. H'rg Minute Entry, Dkt. 55). According to Kathleen Maurella, Waterloo's Chief Marketing Officer, Waterloo is a "home grown company here in Austin" that was founded in 2017 and has sold flavored sparkling water beverages under the Waterloo Sparkling Water® design mark since 2017. (*Id.*); (Maurella Decl., Dkt. 17-2, at 2). Waterloo sells sparkling beverages "that feature distinct, compelling flavors along with Waterloo's signature visual identity

1

and packaging design." (Maurella Decl., Dkt. 17-2, at 2). Waterloo's sparkling beverages are nonalcoholic. (*Id.* at 4). Some of Waterloo's customers mix Waterloo Sparkling Water with alcohol to create cocktails. (*Id.*). Waterloo Sparkling Water sometimes "appears on the same store aisles and shelves as alcoholic beverages" and is "available for purchase in liquor stores." (*Id.*). Waterloo also engages in cross-promotional campaigns with alcohol companies. (*Id.* at 5). Waterloo has not introduced its own alcoholic sparkling beverage, even though other sparkling water brands have, (*id.*), and wants to preserve the status quo, (Minute Entry, Dkt. 55) ("Our goal very simple. We want to preserve the status quo. There is not a competing ready to drink product with the Waterloo name in the sparkling beverage category. We own that.").

The status quo for Waterloo is lucrative. Waterloo Sparkling Water has been a "runaway success," generating $79 million in sales in 2020. (Maurella Decl., Dkt. 17-2, at 2). According to Waterloo, that's over 270 million cans and a 72% increase over the previous year. (*Id.*). Waterloo sells Waterloo Sparkling Water in all 50 states in more than 15,500 retail stores like Whole Foods Market, Costco, Target, Kroger, Walmart, Publix, and H-E-B/Central Market. (*Id.* at 2–3). Waterloo promotes Waterloo Sparkling Water on websites and digital platforms like Instagram and Twitter, with its social media posts garnering over 320 million impressions. (*Id.* at 3). Celebrities like Justin Bieber and Alec Baldwin have praised it on social media. (*Id.* at 4). Waterloo claims it is "among the most highly recognizable sparkling water brands." (*Id.*).

Waterloo applied for its design mark in 2017 and obtained its mark—U.S. Trademark Registration No. 5356607—on December 12, 2017. The registration covers the text and design of Waterloo's "signature logo:"



(Registration, Dkt. 17-2, at 10). Waterloo's mark is in "Class 32: Sparkling water." (*Id.*). Waterloo also claims "exclusive nationwide common law trademark rights to 'Waterloo' in connection with sparkling beverages." (Prelim. Inj. Mot., Dkt. 17, at 9). Waterloo describes its trade dress as "distinctive and protected" and provides the following image of its representative trade dress:



(Waterloo Cans, Dkt. 17-2, at 13); (Prelim. Inj. Mot., Dkt. 17, at 10).

Defendants Daniel Barnes ("Barnes") and Brandon Cason ("Cason") previously worked for Waterloo.[1] (Maurella Decl., Dkt. 17-2, at 6). Waterloo terminated their employment in 2018 and 2019, respectively. (*Id.*). Barnes and Cason both hold a small ownership interest in Waterloo. (*Id.*). Barnes is the CEO of Treaty Oak which has sold "Waterloo No. 9 Gin" but not a sparkling beverage. (*Id.*). Cason is the CEO of Spirited Cocktails Corporation ("Spirited Cocktails"), which sells alcoholic seltzer beverages under brand name "Canteen." (*Id.*). Although Cason and Spirited

---

[1] The parties have differing versions of Barnes and Cason's working relationships with Waterloo and how those working relationships came to an end. At this point, those details do not affect this Court's decision on Waterloo's preliminary injunction motion, and the Court will rely on Waterloo's version as it need not delve into more detail for the purpose of deciding Waterloo's motion.

Cocktails are no longer part of this litigation, as explained below, Cason and Spirited Cocktails played a role in the beginnings of this dispute.

By way of background, Barnes founded Treaty Oak in 2006. Treaty Oak distills and sells whiskey and gin. (Barnes Decl., Dkt. 42-1, at 1). Starting in 2012, Treaty Oak sold its gin under its Waterloo marks: "Waterloo No. 9 Gin," "Waterloo Antique Gin," and "Waterloo Old Yaupon Gin." (*Id.* at 1–2). Treaty Oak owns a federal trademark registration for the word mark "Waterloo No. 9 Gin," U.S. Reg. No. 3,589,787, in International Class 033 for "spirits," (*id.* at 2), "giving it exclusive nationwide rights to use that mark in connection with those goods."[2] (Treaty Oak Resp., Dkt. 42, at 7). Treaty Oak's gins are sold at its facility in Dripping Springs, Texas, in seven states, and online in 34 states. (Barnes Decl., Dkt. 42-1, at 2). Spirited Cocktails produces and sells canned, flavored vodka sodas called Canteen. (*Id.* at 3). In 2020, Spirited Cocktails and Treaty Oak "entered into discussions regarding a license that would allow Spirited Cocktails to use Treaty Oak's WATERLOO NO. 9 GIN trademark" to create a gin product in "different fruit based flavors with each can depicting the corresponding color." (Treaty Oak Resp., Dkt. 42, at 11; *see* Barnes Decl., Dkt. 42-1, at 4).

In January 2021, Waterloo learned that Defendants planned to launch a new product called "Waterloo No. 9 Gin Spritz." (Maurella Decl., Dkt. 17-2, at 6). At the time, Defendants planned to sell a product with this design:

---

[2] The parties extensively brief whether Treaty Oak's date of first use matches the date of first use provided in its registration. As it turns out, that date was incorrect, and Treaty Oak has filed an amendment so that its registration accurately reflects its date of first use. Waterloo states that Treaty Oak failed to disclose the amendment *and* that Treaty Oak's failure to disclose "calls into doubt the credibility of their factual assertions." (Reply, Dkt. 51, at 6). In response, Treaty Oak defends its "inadvertent error" and then accuses Waterloo of "remarkably" failing to disclose an updated version of its registration. (Sur-reply, Dkt. 54-3, at 4). The Court appreciates the parties drawing the Court's attention to inadvertent errors and updated information; however, the Court counsels the parties to save their outrage for clear and deliberate instances deception.



(Treaty Oak Gin Spritz 1, Dkt. 17-4, at 36; *see* Barnes Decl., Dkt. 42-1, at 5). Waterloo argues the

design is "virtually identical to Waterloo's trade dress." (Prelim. Inj. Mot., Dkt. 17, at 11). Waterloo

provides this side-by-side comparison of its products with Defendants' planned products:



(Mot., Dkt. 17, at 6). Later, Treaty Oak and Barnes (the "Treaty Oak Defendants") disclaimed that

packaging in favor of these can labels:



(Barnes Decl., Dkt. 40, at 14–15). The Treaty Oak Defendants represent that they are moving

forward only with this new design. (*Id.*) ("Treaty Oak intends to market and sell these WATERLOO

NO. 9 GIN & TONIC beverages to its existing distributor network.").

Waterloo believed that Defendants' release of its new product line was imminent because

Defendants took actions to ready their product for sale. Defendants had obtained Certificates of

Label Approval from the United States Alcohol and Tobacco Tax and Trade Bureau, (Maurella

Decl., Dkt. 17-2, at 7), and is in the process of obtaining government approval to produce and sell

its products, (Barnes Decl., Dkt. 40, at 14). Defendants also gave an interview to Forbes that was

published on February 15, 2021 in which Cason discussed that he and Barnes intended to launch their gin spritz product. (Forbes article, Dkt. 17-4). Cason described how the gin spritz product was built, in part, upon his experience as a cofounder of Waterloo because mixing "Waterloo" with vodka was a "no-brainer." (*Id.* at 49).

Two days later, on February 17, 2021, Waterloo filed this lawsuit. Waterloo asks the Court to enjoin Defendants from using its marks, trade dress, and the name Waterloo on its alcoholic seltzer and to award damages and attorney's fees. (Compl., Dkt. 1, at 20–21). On May 3, 2021, Waterloo, Cason, and Spirited Cocktails filed a Stipulated Injunction and Consent order. (Dkt. 15). Cason and Spirited Cocktails agreed to "halt, cease and desist any promotion, marketing, sale or distribution of the WATERLOO NO. 9 GIN SPRITZ product." (*Id.* at 2). On May 5, this Court entered that order, (Dkt. 20), effectively removing Cason and Spirited Cocktails from the case.

After reaching an agreement with Cason and Spirited Cocktails, Waterloo filed its motion for preliminary injunction on May 4, 2021. (Prelim. Inj. Mot., Dkt. 17). Waterloo asks this Court to preliminarily enjoin the Treaty Oak Defendants from using the allegedly infringing marks, infringing trade dress, the WATERLOO SPARKLING WATER® design mark, the Waterloo Sparkling Water trade dress, and the WATERLOO word mark "in connection with the sale, offering to sell, advertising, marketing, or distribution of alcoholic seltzer products or similar sparkling beverages in the United States." (*Id.* at 30). Barnes filed a response on June 17, 2021. (Barnes Resp., Dkt. 40). The Treaty Oak Defendants responded on June 18, 2021. (Treaty Oak Resp., Dkt. 42). Waterloo replied on July 12, 2021. (Reply, Dkt. 51). The Treaty Oak Defendants filed an opposed motion for leave to file a sur-reply and supplemental declaration. (Sur-reply, Dkt. 54).[3] Additionally, Waterloo filed an

---

[3] During the hearing, Waterloo stated that if the Court "finds the information that was presented by the [Treaty Oak] defendants useful or helpful, we're happy for your Honor to look at it and just get on with today's proceeding." (Hr'g Tr., at 2). With that, the Court considers the motion to be unopposed and will grant the motion for leave.

objection to the Treaty Oak Defendants' expert report prepared by David Franklyn. (Obj., Dkt. 52). Treaty Oak filed a response on July 21, 2021. (Resp. Obj., Dkt. 53). This Court held a hearing on the preliminary injunction and Waterloo's expert report objection on July 23, 2021. (Minute Entry, Dkt. 55).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## III. DISCUSSION

The Court reaches only the issue of whether Waterloo has met its burden of showing likelihood of success on the merits. To prevail on a trademark infringement claim, a plaintiff must establish: (1) ownership in a legally protectable mark; and (2) infringement by demonstrating a likelihood of confusion. *Bd. of Supervisors for Louisiana State Univ. Ag. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008). Ownership of a mark is established by actual use in the market. *Id.* at 475. Infringement claims under Texas common law are analyzed under the same framework as federal trademark law. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th

Cir. 2010). Texas unfair competition claims are also governed by the likelihood of confusion standard. *Scott Fetzer Co. v. House of Vacuums*, 381 F.3d 477, 484 (5th Cir. 2004).

### A.      Waterloo Fails to Show Its Trademark Rights Extend to Alcoholic Beverages

Waterloo first must show that it possesses a legally protectable trademark rights before the Court can reach the issue of whether the Treaty Oak Defendants have infringed or will infringe Waterloo's trademark and trade dress. While the parties do not dispute that Waterloo has a federal trademark registration for its Waterloo design mark, the parties dispute whether Waterloo has broader rights to the word mark WATERLOO and whether Waterloo's rights, whatever they are, extend beyond sparkling water and to alcoholic beverages. Waterloo claims superior rights to use "Waterloo" on canned, sparkling beverages, including sparkling alcoholic beverages. (Reply, Dkt. 51, at 6–7). Waterloo argues that: (1) its WATERLOO word mark is inherently distinctive, because standing alone it does not inherently describe sparkling beverages, (2) it has used the mark on "hundreds of millions of cans of sparkling water sold throughout the United States and on cross-promotions for cocktails that mix Waterloo sparkling water with premium spirits brands," and (3) the Treaty Oak Defendants failed to meet their burden of showing their trademark rights are senior to Waterloo's rights. (Prelim. Inj. Mot., Dkt. 17, at 17–18; Reply, Dkt. 51, at 6–7). In response, the Treaty Oak Defendants contend that Waterloo does not own the word Waterloo, and, although it may have "very limited rights" in Waterloo, it has no rights to Waterloo in connection with alcoholic beverages. (Treaty Oak Resp., Dkt. 42, at 16).

Waterloo has failed to show it has superior rights to the word Waterloo for sparkling alcoholic beverages. While Waterloo's federal registration for its WATERLOO design mark contains the word Waterloo, Waterloo's registration "is only prima facie evidence of [its] exclusive right to use the mark in commerce for the services specified in the registration." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (citing 15 U.S.C. § 1115(a)). Waterloo's registration is in

9

Class 32 for "sparkling water," giving Waterloo an exclusive right to use its mark in the sparkling

water space. Waterloo's mark in addition to use of its mark could be sufficient to establish that

Waterloo has superior rights to use "Waterloo" in other contexts like sparkling alcoholic beverages.

(*See* Treaty Oak Resp., Dkt. 42, at 16). To demonstrate its superior rights, Waterloo attempts to

show it has been the "dominant and priority user of WATERLOO in the canned, sparkling

beverage category." (Reply, Dkt. 51, at 6). Waterloo points to its success selling "hundreds of

millions of cans of Waterloo Sparkling Water each year" and shows it has been "continuously selling

in all fifty states since April 2018." (*Id.* at 6–7). The Treaty Oak Defendants largely accept Waterloo's

contentions regarding its sales, both the volume and the geographic reach, but dispute that

Waterloo's success in the sparkling water category establishes Waterloo's superior rights to

WATERLOO for alcoholic beverages.

     While Waterloo has a successful sparkling water business that employs its WATERLOO

mark and arguably has superior rights to its mark and the word "Waterloo" for sparkling water,

Waterloo does not have superior rights in connection with alcohol products that would enable it to

stop the Treaty Oak Defendants from using its mark on alcohol products. Waterloo has not used its

mark on alcohol products or competed in that space. "Ownership of trademarks is established by

use." *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839,

842 (5th Cir. 1990). A plaintiff cannot acquire trademark rights unless and until it can show "prior

use" meaning "goods bearing the mark are placed on the market." *Alamo Area Mut. Hous. Ass'n, Inc.

v. Lazenby*, No. 5:17-CV-634-DAE, 2017 WL 7052253, at *7 (W.D. Tex. July 28, 2017). Waterloo

does not use its mark to compete in the market for alcoholic beverages. As pointed out by Treaty

Oak at the hearing and not refuted by Waterloo, Waterloo does not currently sell alcohol products

and has no plans to sell alcohol products. "[T]he right to exclude others is limited in various ways. A

senior user [may not exclude] others in areas where he does not currently do business nor is likely to

do business in the future." *Union Nat. Bank of Texas*, 909 F.2d at 843. Waterloo admittedly is not in the alcoholic beverages business.

Waterloo instead claims that its rights extend to alcohol products "because it already participates in the space and because a seltzer product is within its natural zone of expansion . . . ." (Reply, Dkt. 51, at 14). Waterloo argues that it is already competing in the alcohol products market because 20% of its customers report that they sometimes drink Waterloo Sparkling Water instead of alcohol and 25% use it as a mixer and Waterloo promotes its product "with cocktail and mocktail recipes on its social media channels." (Maurella Decl., Dkt. 17-2, at 4–5). Waterloo offers no legal support for the notion that cross-promotions establish trademark rights. As such, Waterloo's cross-promotions with alcohol companies do not give it priority for alcoholic sparkling beverages.

To bolster its argument, Waterloo claims that adding alcohol to its sparkling water would be within its natural zone of expansion. Waterloo points to other non-alcoholic sparkling beverage brands that have expanded into alcohol products: "Spindrift, Topo Chico, Polar Seltzer, and Sparkling Ice." (Prelim. Inj. Mot., Dkt. 17, at 19). Waterloo also states that customers in its focus groups say they expect Waterloo to introduce an alcohol product. (*Id.*). Waterloo could prove that sparkling alcoholic beverages would be within its natural zone of expansion by showing that its customers believe it to be, even if that perception is false. *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 826 (S.D. Tex. 1999). Waterloo, however, has not shown that its customers believe that; rather, Waterloo makes the vague statement that "in focus groups our customers have identified alcoholic seltzers as an obvious brand extension for Waterloo." (Maurella Decl., Dkt. 17-2, at 4). The Court expresses no opinion on the specific evidence required to establish customer beliefs about the natural zone of expansion. However, it is clear that Waterloo's meager offerings here fall short of the proof necessary to sustain that conclusion. From a single, unsupported assertion that some unknown number of customers in focus groups believed it to be

true, the Court cannot jump to the conclusion that Waterloo's customers believe that sparkling alcoholic beverages are within Waterloo's natural zone of expansion.[4]

Finally, while Waterloo's registered mark—that includes the word "Waterloo"—may be distinctive, Waterloo seems to be making a claim to the word "Waterloo" more broadly and outside of sparkling water. Waterloo argues that its "WATERLOO SPARKLING WATER® design *and* WATERLOO word mark are . . . inherently distinctive." (Prelim. Inj. Mot., Dkt. 17, at 18) (emphasis added). Many companies employ "Waterloo" as part of their name or as part of a mark. Two hundred and nineteen companies with the word "Waterloo" as part of their name have applied for trademark registration. (Bagdady Decl., Dkt. 42-2, at 1). "There are 104 marks that were applied for with the word 'Waterloo' as the mark or as part of the mark," including two of Waterloo's marks. (*Id.*). The Texas Secretary of State's business entity database produces 352 results for business entities with "Waterloo" in their name, 165 of which are in use. (*Id.* at 1–2). Waterloo Cellars has a registration and uses "Waterloo" as part of their mark on its wine products and Waterloo Ice House sells bottles of Waterloo "Austin Original" House Wine. (*Id.* at 2, 16; Treaty Oak Resp., Dkt. 42, at 19). In all, Waterloo would have difficulty claiming broad trademark rights to the word "Waterloo" outside of the narrow sparkling water category.[5]

---

[4] To the contrary, mixing its gin products with tonic may be in Treaty Oak's zone of natural expansion. Treaty Oak has a federal registration for "spirits" and under federal and Texas law, a bottle of gin and a canned gin and tonic equally qualify as "distilled spirits." (Treaty Oak. Resp., Dkt. 42, at 25) (quoting Texas Alcoholic Beverage Code § 1.04(3); 27 C.F.R. § 5.11). While there may be brands that increasingly sell both nonalcoholic and alcoholic beverages, "alcoholic and nonalcoholic beverages are distinct commodities in our culture." *Best Flavors, Inc. v. Mystic River Brewing Co.*, 886 F. Supp. 908, 914 (D. Me. 1995). The District of Maine explained the distinction: "Alcoholic beverages are subject to extensive state regulation, which makes them unavailable to people under 21 and which restricts the trademark owner's control over where they can be distributed. In addition, consumers are consciously aware of whether they are choosing an alcoholic or a nonalcoholic beverage." *Id.*

[5] The Treaty Oak Defendants also attack "Waterloo" as being geographically descriptive because Waterloo was the original name of the city of Austin. (Treaty Oak Resp., Dkt. 42, at 19). A geographic term, alone, is descriptive and may mean the mark is invalid or not protectable. *Union Nat'l Bank*, 909 F.2d at 845 ("Geographical terms such as 'Texas,' 'Midwest,' 'Madison Avenue,' or 'Philadelphia' are also considered descriptive terms when they describe where the products or services are offered or manufactured"). The

Based on the record presented to the Court at this juncture, Waterloo has failed to show that it has a senior mark for sparkling alcoholic beverages. Waterloo does not use its mark in that market, does not plan to use its mark in that market, and has not shown that its customers believe it will enter that market. Waterloo's registered mark and common law rights through its use of its mark for sparkling water products do not provide it with broad rights that would enable Waterloo to exclude the Treaty Oak Defendants from sparkling alcoholic beverages.

## B. Trade Dress

In addition to arguing that it possesses legally protectable trademark rights that extend to sparkling alcoholic beverages, Waterloo asserts that it is the owner of rights in its distinctive trade dress for Waterloo Sparkling Water. Trade dress "refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Test Masters Educ. Svcs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015) (quotation omitted). "The Lanham Act creates a cause of action for trade dress infringement." *Id.* "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'" *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (alteration in original). To succeed on a claim for trade dress infringement, a plaintiff must show that "(1) the dress qualifies for protection, which requires considering functionality, distinctiveness, and secondary meaning; and (2) that the dress has been infringed, which requires considering the likelihood of confusion." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117-18 (5th Cir. 1991) (citation omitted), *aff'd*, 112 S. Ct. 2753 (1992). An unregistered trade dress may be protectable under section 43(a) of the

---

Court declines to make a finding of whether Waterloo is geographically descriptive based on the limited evidence and briefing before it at this stage.

Lanham Act if the trade dress is distinctive and nonfunctional. *Test Masters Educ. Servs., Inc.*, 791 F.3d at 565.

Waterloo claims its trade dress is "inherently distinctive because its unique combination of visual elements does not describe or suggest any attribute of its product." (Prelim. Inj. Mot., Dkt. 17, at 21). Waterloo contends that "nothing about a large serif-font "WATERLOO,' a prominent ornamental banner, curving lines and tendrils, the placement and font of Waterloo's flavor description, the format and placement of Waterloo's sugar and calorie claims, or the coloration of Waterloo's can background . . . describes or suggests any attributes of Waterloo's products." (*Id.*). According to Waterloo, the sole purpose of its combination of features is to identify the source of its products as Waterloo. The Court agrees. Waterloo's packaging is distinctive to identify the contents as Waterloo Sparkling Water.

The Treaty Oak Defendants first introduced packaging for their canned gin and tonic that closely mimicked Waterloo's trade dress but later abandoned that packaging. During the preliminary injunction hearing, the Treaty Oak Defendants clarified, "that product . . . [is] not going to see the light of day, and there's really no active case or controversy on that product because there were no sales and there aren't going to be any sales." (Minute Entry, Dkt. 55). They also disclaimed the possibility of launching a gin and flavored sparkling water product, admitting that if they used the words sparkling water on their products it "certainly . . . would be a closer case [but] Treaty Oak doesn't have plans to do something like that." (*Id.*). The Treaty Oak Defendants likely abandoned their original packaging and any possibility of selling a flavored alcoholic sparkling water product because both of those scenarios likely would engender confusion. Despite their protestations that it was not intentional, the Treaty Oak Defendants' original packaging blatantly infringed Waterloo's trade dress. While the Treaty Oak Defendants' new packaging—that closely resembles packaging Treaty Oak has used before—does not infringe Waterloo's trade dress, the Court is sympathetic to

14

Waterloo's plight of playing whack-a-mole with Treaty Oak's proposed packaging. Thus, the Court will enjoin the Treaty Oak Defendants from infringing Waterloo's trade dress.

### C. Likelihood of Confusion

Although the Court already found that Waterloo lacks trademark rights to exclude the Treaty Oak Defendants from using the word "Waterloo" on sparkling alcoholic beverages, the Court evaluates whether Waterloo has established a likelihood of confusion. "A 'likelihood of confusion' means that confusion is not just possible, but probable." *Scott Fetzer Co. v. House of Vacuums*, 381 F.3d 477, 483 (5th Cir. 2004). In the Fifth Circuit, the likelihood of confusion is assessed by eight factors: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers. *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 453 (5th Cir. 2017). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id.* The factors "serve only as guides, not as an exact calculus." *Springboards to Educ. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019).

#### 1. Type of Mark

Waterloo contends that all of the factors support a finding of likelihood of confusion. Waterloo argues that its mark is strong because the dominant feature of the logo—the word "Waterloo" in a stylized and fanciful font—does not describe sparkling water. (Prelim. Inj. Mot., Dkt. 17, at 23). While Waterloo registered "WATERLOO SPARKLING WATER® & Design" and that mark may be strong, Waterloo asserts it also has protectable rights in the word "Waterloo" on its own. (*Id.*). Waterloo has not shown that its rights to the mark "Waterloo" alone are strong.

#### 2. Similarity Between the Two Marks

Waterloo's registered mark and Treaty Oak's registered mark are dissimilar. Treaty Oak holds a registration to WATERLOO NO. 9 GIN "without claim to any particular font style, size or color." (Treaty Oak registration, Dkt. 42-1, at 10). Waterloo's mark looks like this:



Waterloo urges the Court to focus on its stylized and fanciful font while it simultaneously asks the Court to ignore those distinctive elements of its mark in enjoining Treaty Oak from using the word "Waterloo." It has seemingly little regard for Treaty Oak's federal registration and existing use of the word "Waterloo" as a part of its marks. (*See* Treaty Oak Resp., Dkt. 42, at 24–25). Waterloo argues that "[e]ven after Defendants withdrew their overt knock-off, the dominant feature of the Waterloo No. 9 Gin & Tonic is still WATERLOO, which appears in large type on the upper third of the can." (Reply, Dkt. 51, at 19). The Treaty Oak Defendants designed these labels "for its upcoming WATERLOO NO. 9 GIN & TONIC canned products:"



(Barnes Decl., Dkt. 40, at 14–15). Given the clear differences in appearance between the two, the Court is satisfied that the registered marks are not similar.[6]

---

[6] Treaty Oak also offers the survey conducted by David Franklyn ("Franklyn"), a professor of law at Arizona State University, for the proposition that the trade dress and trademarks used by the parties are dissimilar. (Treaty Oak Resp., Dkt. 42, at 25). Franklyn conducted an Eveready survey "to measure the extent to which consumers might confuse or associate the gin and tonics with plaintiff's water products." (*Id.*). Franklyn's survey showed that Treaty Oak's products do not create any appreciable likelihood of confusion. (*Id.*; *see generally* Franklyn Report, Dkt. 42-4). Waterloo objects to Franklyn's report and survey because it is "biased, unreliable, and contravenes fundamental principles of survey research." (Obj., Dkt. 52, at 1). Waterloo argues that Franklyn (1) "arbitrarily excluded nearly **one quarter** of respondents who completed the survey," and (2) used an inappropriate survey method that did not show participants Waterloo's product and underreported confusion since the products normally appear next to each other in stores. (*Id.* at 2–5). Waterloo describes the Eveready survey as requiring respondents to know the Waterloo Sparkling Water brand "out of thin air" and therefore not appropriate for a brand that is not top of mind like "Google, Nike, or Apple." (*Id.* at 3-4).

### 3. Similarity of the Products

The products are both similar and dissimilar. On the one hand, Waterloo is correct that both are sparkling beverages. On the other hand, Waterloo's product has flavors, and Treaty Oak's contains alcohol and is not flavored beyond the addition of tonic. Waterloo also has introduced some evidence showing that customers "often drink sparkling water as an alternative to cocktails," (Prelim. Inj. Mot., Dkt. 17, at 24; *see* Maurella Decl., Dkt. 17-2, at 4–5). The Court finds that this factor is neutral as there is some credence to both positions. Waterloo claims that it would just add alcohol to its existing product, and Treaty Oak claims it would just add tonic water to its existing product. The Court acknowledges the difference between alcoholic and nonalcoholic beverages but also recognizes that both companies sell sparkling beverages.

### 4. Retail Outlets and Identity of Purchasers

Between the parties' products, some overlap exists between the retail outlets that sell the products and the identity of purchasers. Waterloo cites that 55% of its customers report consuming spiked seltzers at least several times a year. (Prelim. Inj. Mot., Dkt. 17, at 24–25). Yet, while the parties' products may be sold at some of the same stores, Treaty Oak's product is an alcoholic beverage that is highly regulated by states and only can be purchased by people who are 21 years and older. (Treaty Oak Resp., Dkt. 42, at 28). Based on the current record, Waterloo has not shown that a purchaser of sparkling water would potentially be confused by a gin and tonic product because of an overlap in retail outlets.

### 5. Identity of Advertising Media

The parties "use the same media and advertising channels, including Facebook, Instagram, Twitter, YouTube, and other social and traditional media channels." (Prelim. Inj. Mot., Dkt. 17, at

---

Waterloo asks that the Court exclude Franklyn's survey or afford it no weight when making a likelihood of confusion determination. Because the Court makes its determination without relying on Franklyn's survey, this Court will dismiss Waterloo's objection without prejudice as moot.

25). The Treaty Oak Defendants argue that almost all companies use those same media outlets, and the factor is thus neutral. Promoting a product on social media, even if it is a common advertising platform, tends to support, rather than detract from, a finding of identify of advertising media. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009) (finding an inference where both companies used three forms of advertisements including "Internet promotion"). This factor favors Waterloo.

### 6. Treaty Oak Defendants' Intent

A defendant's intent "may alone be sufficient to justify an inference that there is a likelihood of confusion." *Streamline*, 851 F.3d at 455. The "intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Id.* "[K]nowledge" of a senior user's mark may give rise to a presumption that the junior user intended to cause confusion, but "mere awareness of the senior user's mark does not establish bad intent." *Id.* (cleaned up). Waterloo has not introduced evidence that the Treaty Oak Defendants intended to capitalize on Waterloo's reputation and success with Waterloo Sparkling Water. Waterloo may be able to produce evidence of that intent following discovery, but the only evidence on this issue is (1) a series of text messages between employees of Waterloo, Treaty Oak, and Spirited Cocktails and (2) the Forbes article. In those texts, Defendants disclosed their plans to Waterloo, disclaimed adding flavored sparkling water to the planned product, and changed the design of the packaging after Waterloo objected to the original packaging. (Text messages, Dkt. 42-1, at 17–20). In the Forbes article, Cason did say that it "was a no-brainer to mix Waterloo" with spirits, (Forbes article, Dkt. 17-4, at 49), but Cason was arguably speaking from his experience as a cofounder of Waterloo and not with the intent to confuse. While the Court is not surprised that the article caused confusion, the Court distinguishes between unintentional and intentional actions. At this time, there is no evidence that Cason or the Treaty Oak Defendants intended to trade off of Waterloo's goodwill or its mark, a finding that—as

Waterloo urges—might be different were the Treaty Oak Defendants to have continued with their original packaging design.

### 7. Actual Consumer Confusion

"Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion." *Streamline Prod. Sys., Inc.*, 851 F.3d at 457 (quoting *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 483 (5th Cir. 2008)). Waterloo points to two types of evidence in support of this factor: (1) that a "cross-promotional spirits partner contacted Waterloo to express surprise and confusion about its apparent expansion into alcoholic seltzer" and (2) Waterloo's survey evidence. (Prelim. Inj. Mot., Dkt. 17, at 26; Reply, Dkt. 51, at 22). On January 13, 2021, Waterloo was contacted by the cross-promotions partner at Bacardi who learned of the "'Waterloo No. 9 Botanicals Citrus Gin Spritz' and other flavors and thought that Waterloo was coming out with the new product." (Maurella Decl., Dkt. 17-2, at 7). Waterloo points out that there was confusion "even among knowledgeable industry professionals." (Prelim. Inj. Mot., Dkt. 17, at 14); (*see also* Maurella Decl., Dkt. 17-2, at 8) ("Based on my experience in the CPG industry, such reports of confusion between products are rare."). However, this factor evaluates actual *consumer* confusion. As such, the evidence of confusion on behalf of a business partner is not evidence of actual consumer confusion, although it suggests there could be actual consumer confusion.

The Court moves to the second type of evidence Waterloo presents: survey evidence. After filing its preliminary injunction motion, Waterloo filed a Supplemental Brief in Support of Motion for Preliminary Injunction, (Dkt. 32), that describes and contains survey evidence. Waterloo argues that the surveys, designed by Robert W. Palmatier, Ph.D. ("Palmatier"), a professor of marketing and business administration at the University of Washington, show that confusion will occur even with Treaty Oak's redesigned packaging. (*Id.* at 2). "The level of net confusion produced by the

appearance of the Infringing Products and Defendants' use of the WATERLOO mark was 43% for

the non-imitative design and 46% for the packaging that mimics Waterloo's trade dress." (*Id.*). The

survey specifically tested Waterloo Sparkling Water against "non-imitative trade dress" and

"imitative trade dress:"



(*Id.* at 3). Based on the survey evidence, the level of confusion seems to favor Waterloo.

The Treaty Oak Defendants, however, argue that Palmetier's survey is "fatally flawed"

because it is a "Squirt" survey in which the subjects "look at an enlarged photo of plaintiff's

sparkling water can . . . and then [see] a lineup of cans of alcohol products" and are "effectively

asked . . . to match one of them to plaintiff's product." (Treaty Oak Resp., Dkt. 42, at 30).

According to the Treaty Oak Defendants and their expert Hal Poret ("Poret"), this type of survey

does not reflect realistic marketplace conditions because it assumed the parties' products would be

next to or near each other in stores, was "excessively unrealistic and suggestive" because the subjects

were exclusively shown a lineup of alcoholic beverages suggesting "there must be some connection

between" them, tested two products that will not be introduced into the marketplace, used leading

questions, surveyed an artificial universe of subjects and not customers likely to purchase Treaty

Oak's products, and failed to use a reliable control group. (*Id.* at 31) (quoting Poret Report, Dkt. 42-

5, at 3). The Court agrees that Palmetier's survey may have flaws, but, more significantly, the Court

finds that Waterloo has not shown actual confusion largely because Palmetier conducted a survey using two forms of trade dress that the Treaty Oak Defendants state they will not use. Importantly, Treaty Oak's new design lacks the phrase "gin spritz," the word "Waterloo" does not appear larger than the surrounding words, the beverage is not flavored, and the design now reads "Gin and Tonic." (Barnes Decl., Dkt. 40, at 14–15).

### 8. Degree of Care

The final factor is whether consumers exercise a relatively low degree of care, which is dependent, in part, on the price of the item. "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Streamline Prod. Sys., Inc.*, 851 F.3d at 458 (quoting *Smack Apparel*, 550 F.3d at 483). Waterloo states, and the Treaty Oak Defendants do not refute, that sparkling beverages are low-priced items for which consumers exercise a low degree of care. (Prelim. Inj. Mot., Dkt. 51, at 22). The Treaty Oak Defendants argue that Waterloo ignores the distinction between alcoholic and nonalcoholic products. (Treaty Oak Resp., Dkt. 42, at 32). The Court agrees that while sparkling beverages may be inexpensive, consumers do take care to buy an alcoholic beverage versus a nonalcoholic beverage and vice versa. Waterloo has not met its burden on this factor.

### 9. Conclusion Regarding Likelihood of Confusion

Taking into consideration all of the factors and weighing them based on the Fifth Circuit's guidance and their application to this case, the Court finds that Waterloo has not met its burden to establish a likelihood of confusion on the part of consumers for the purposes of obtaining a preliminary injunction on the facts as they now stand.

### IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Waterloo's Motion for Preliminary Injunction, (Dkt. 17), is **DENIED IN PART AND GRANTED IN PART**. The Court **ENJOINS** the

Treaty Oak Defendants from infringing Waterloo's trade dress. Waterloo's motion is otherwise

**DENIED**.

      **IT IS FURTHER ORDERED** that the Treaty Oak Defendants' motion for leave to file a

sur-reply and supplemental declaration, (Dkt. 54), is **GRANTED** as unopposed.

      **IT IS FINALLY ORDERED** that Waterloo's Objection to Expert Report of David

Franklyn, (Dkt. 52), is **DISMISSED WITHOUT PREJUDICE AS MOOT**.

      **SIGNED** on November 24, 2021

                                     _____

                                       ROBERT PITMAN
                                       UNITED STATES DISTRICT JUDGE